### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

KENNETH R. SELLERS,

        Plaintiff,

v.                                Case No.  02-3055-DJW

DEBORAH BUTLER, et al.,

        Defendants.

### MEMORANDUM AND ORDER

Plaintiff Kenneth Sellers ("Plaintiff") brings this 42 U.S.C. § 1983 action alleging deliberate indifference to his serious medical needs in violation of the Eighth Amendment.  In his Amended Complaint, Plaintiff seeks damages and injunctive relief from five correctional officers, as well as Prison Health Services as an entity.  The matter is currently before the Court on (1) motion for summary judgment filed by the five correctional defendants (doc. 138); and (2) motion for partial summary judgment filed by the five correctional defendants (doc. 167).  For the reasons set forth in detail below, both motions will be denied.

**A.**    **Uncontroverted Facts[1]**

1.    Plaintiff was in the custody of the Kansas Secretary of Corrections from May 2001 to February 2004 at the following institutions:

        May 2001 to June 2001:    El Dorado Correctional Facility;

        June 2001 to July 2003:    Ellsworth Correctional Facility; and

        July 2003 to February 2004:    Hutchinson Correctional Facility.

---

[1]The following facts are uncontroverted or, if disputed, are viewed in a light most favorable to Plaintiff.

2.      Defendant Deborah Butler ("Butler") is an employee of the Kansas Department of Corrections ("KDOC") and was the Director of Nursing for Prison Health Services at Ellsworth Correctional Facility during the time Plaintiff resided there.

3.      Defendant William Cummings ("Cummings") is Correctional Manager / Secretary of Corrections Designee for the Kansas Department of Corrections.

4.      Defendant Cody Couch ("Couch") was Plaintiff's Unit Team Counselor at Ellsworth Correctional Facility.

5.      Defendant Raymond Roberts ("Roberts") was the Warden at Ellsworth Correctional Facility when Plaintiff resided at the facility. Roberts supervised Couch.

6.      Defendant Roger Werholtz ("Werholtz") is the Secretary of Corrections for the KDOC.

7.      When Plaintiff arrived at Ellsworth Correctional Facility during the first week of June 2001, he requested an eye exam.

8.      On June 7, 2001, Plaintiff had an eye examination within the facility.

9.      On  June 12, 2001, Plaintiff was examined by an outside optometrist, Dr. Murphy, who made a preliminary diagnosis of glaucoma, photophobia and high eye pressure.  Dr. Murphy prescribed eye glasses for Plaintiff and suggested a gradient tint be added to the lenses in order to relieve the symptoms of photophobia.  He further referred Plaintiff to an ophthalmologist.

10.     Plaintiff informed the staff of Ellsworth Correctional Facility and Prison Health Services that light, particularly sunlight, caused him eye pain and discomfort.  Without tinted glasses, Plaintiff stayed in his cell and did not go outside during time designated for outside activity.

11.     On July 31, 2001, Plaintiff was seen by the ophthalmologist, Dr. Griffith. The preliminary diagnosis of glaucoma was confirmed. Dr. Griffith noted that Plaintiff's eye pressure was elevated, which can cause damage to the optic nerve and irreversible loss of vision if not treated.  Dr. Griffith wrote a prescription for eyeglasses that was different from Dr. Murphy's and also wrote a prescription for eye drops.  Dr. Griffith noted that Plaintiff's condition needed to be monitored.

12.     On August 10, 2001, in response to an inquiry by Plaintiff regarding the status of his tinted glasses, Defendant Butler informed Plaintiff that clip-on sunglasses were available for inmates to purchase at Ellsworth Correctional Facility.  At this time, however, Plaintiff had still not received the prescribed eye glasses to which the clip-ons could be attached.

13.     Plaintiff was seen by Dr. Griffith again on August 23, 2001. Dr. Griffith asked Plaintiff if he had been taking the eye drops, and Plaintiff informed Dr. Griffith that he had not received his prescription eye drops.  Although Dr. Griffith noted that the pressure in Plaintiff's eyes was better/lower, he also indicated that "Patient is at high risk to suffer marked [decrease] vision if IOP not controlled to target level mid to low teens."  Dr. Griffith provided Plaintiff with a sample of the prescribed eye drops at the August 23, 2001 appointment.

14.     Defendant Butler, upon learning of Plaintiff's statement to Dr. Griffith that he had not received his prescription eye drops, contacted Dr. Griffith and accused Plaintiff of lying.

15.     From the end of August 2001 to the end of July 2003, the facility clinic staff administered the prescribed eye drops.  During this time period, Plaintiff was absent from the medication line, as noted by the "A" on the monthly medication administration records, because his medication supply had been depleted and the reorder not yet placed and/or received or because Plaintiff had not been informed that the reordered medication had arrived at the facility.

16.     In her deposition, Defendant Butler testified that if a patient approached her with a question that she could not answer, Defendant Butler either researched the issue, consulted a person who could provide the answer, or referred the patient to an individual who could provide the answer.

17.     Sometime prior to September 2001, Plaintiff asked Defendant Butler for assistance in interpreting the physician's instructions regarding caring for and treating his eye conditions. Notwithstanding her knowledge that Plaintiff was suffering from glaucoma, a serious medical condition, Defendant Butler advised Plaintiff to wait until his next eye appointment in order to ask the physician himself.

18.     When Plaintiff subsequently sought information from another individual within the health clinic, Plaintiff was told by Defendant Butler that he was not to seek assistance from anyone in the clinic other than Defendant Butler.

19.   Plaintiff filed a grievance on September 3, 2001, regarding the length of time that had passed since he was first given a prescription for glasses and the unavailability of his prescription eye drops.

20.   On September 6, 2001, Plaintiff's prescription eyeglasses arrived at Ellsworth Correctional Facility.   Upon receipt, Plaintiff complained that the eyeglasses were not tinted as prescribed.

21.   On September 17, 2001, Plaintiff filed a second grievance regarding inadequate health care for his eye problems.

22.   On September 26, 2001, Warden Roberts issued an interdepartmental memorandum in response to Plaintiff's two grievances with the following findings: "ECF and PHS have provided appropriate medical care.  No further actions necessary."

23.   On October 9, 2001, Plaintiff had an appointment with Dr. Griffith, who reported better/lower pressure in Plaintiff's eyes.

24.   On October 10, 2001, Plaintiff filed an appeal of his grievance.

25.   On October 12, 2001, Plaintiff presented himself for dispensation of his eye drops and noticed that, although new, the seal on the bottle had been broken and the bottle of medication to did not resemble the prior bottles of medication.

26.   Out of fear of either receiving medication other than that prescribed, receiving contaminated medication, or using an eye drop dispenser used by someone else that could cause some sort of an eye infection, Plaintiff refused to receive the medication until a reasonable explanation was provided.

5

27.     Plaintiff made an inquiry on October 13, 2001 with respect to the discrepancy in the appearance of the bottle presented on October 12, 2001 and was told that he would not receive any other or additional medication for thirty days if he did not take the medication presented.

28.     In an effort to resolve the discrepancy, Plaintiff sought the assistance of defendant Couch, Unit Team Counselor, on October 15, 2001.

29.     On October 15, 2001, three days after voicing his concerns, Plaintiff received a memorandum from Prison Health Services staff indicating the medication was the proper medication and had not been tampered with.  Plaintiff received a similar response from Defendant Couch on October 23, 2001.

30.     By virtue of the discrepancy in the appearance of the medication, the broken seal and the passage of time in receiving an explanation, Plaintiff did not receive his medication from October 12 through October 15, 2001.

31.     At some time between mid-October and mid-November, Plaintiff learned from the optometry assistant that it was Defendant Butler who made the decision to disregard the suggestion within the prescription to tint Plaintiff's glasses.

32.     Soon thereafter, Plaintiff was called out for an appointment with the optometry assistant, who informed Plaintiff that she would not document Defendant Butler's conduct for fear of getting into trouble.

33.     During this discussion between Plaintiff and the optometry assistant, Defendant Butler
        entered the room and instructed Plaintiff to direct all questions to Defendant Butler and not
        the facility optometry assistant.  Plaintiff was informed by Defendant Butler that further
        action would be taken against him if he disregarded this directive.

34.     After returning to his cell, Plaintiff was informed by Defendant Couch that if Plaintiff again
        contacted the optometry assistant, Defendant Couch would charge Plaintiff with stalking.

35.     On October 26, 2001, Secretary of Corrections Designee Cummings issued a decision on
        appeal, finding that Plaintiff has access to adequate medical care.

36.     On November 26, 2001, Plaintiff had an appointment with Dr. Griffith, who found
        Plaintiff's condition to be slightly worse.  Dr. Griffith noted mild photophobia, prescribed
        rose-tinted eyeglasses and provided a different prescription eye drops to improve/lower
        the pressure.

37.     On January 24, 2002, Plaintiff had an appointment with Dr. Griffith, who reported the
        pressure was lower and had improved.

38.     On June 6, 2002, Plaintiff had an appointment with Dr. Griffith, who found the pressure
        was higher and prescribed different eye drops.

39.     On August 5, 2002, Plaintiff had an appointment with Dr. Griffith, who found improved
        pressure in the target range.

40.     On December 3, 2002, Plaintiff had an appointment with Dr. Griffith, who found the
        pressure higher and prescribed different eye drops.

7

41. On March 6, 2003, Plaintiff had an appointment with Dr. Griffith, who found the pressure to be the same and prescribed a new type of eye drops.

42. On April 8, 2003, Plaintiff had an appointment with Dr. Griffith, who found the pressure improved and in the target range. New eyeglasses were prescribed.

43. On May 13, 2003, Plaintiff had an appointment with an optician who fitted him for new prescription eyeglasses. A check with Dr. Griffith established that the eyeglasses were to be tinted. The eyeglasses were ordered on that date.

44. On July 29, 2003, Plaintiff was transferred to Hutchinson.  Plaintiff notified health staff immediately upon his transfer that he was scheduled to see Dr. Griffith in early August.

45. On August 29, 2003, Plaintiff was seen by Dr. Williams, who referred him to an ophthalmologist for treatment.  An appointment subsequently was made for Plaintiff to see Dr. Depenbusch, an ophthalmologist.

46. On September 2, 2003, Plaintiff was seen by Dr. Torrence, an optometrist, who continued the prescription eye drops and requested follow-up in four months.  After this appointment, Dr. Torrence determined it was not necessary for Plaintiff to see Dr. Depenbusch and Plaintiff's appointment was cancelled. Dr. Torrence subsequently assumed the care and treatment of Plaintiff's medical condition.

47. In October 2003, Plaintiff had to wait days between receiving his medication while it was restocked by the facility.

48. On November 18, 2003, Plaintiff was seen by the clinic Advanced Registered Nurse Practitioner ("ARNP"), who found Plaintiff's eyes were doing well.

49.     On December 10, 2003, Plaintiff had a routine eye exam with Dr. Ellis.

50.     On January 6, 2004, Plaintiff was seen by Dr. Rettig, Plaintiff's expert ophthalmologist. Dr. Rettig noted that she hoped further treatment would be provided to Plaintiff in the form of laser or other type of surgery to help prevent more vision loss in Plaintiff's eyes.

51.     Although Plaintiff was released from KDOC custody on February 24, 2004, he has since returned to KDOC custody and currently is incarcerated at the Norton Correctional Facility in Norton, Kansas.

**B.     Legal Standard for Summary Judgment**

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.[2]  A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law."[3]  A "genuine" factual dispute requires more than a mere scintilla of evidence.[4]

The moving party bears the initial burden of showing the absence of any genuine issue of material fact.[5]  Once the moving party meets its burden, the burden shifts to the non-moving party to demonstrate

---

[2]*See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

[3]*Anderson*, 477 U.S. at 248.

[4]*Id.* at 252.

[5]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hicks v. City of Watonga*, 942 F.2d 737, 743 (10th Cir. 1991).

that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof."[6]  The non-moving party may not rest on its pleadings but must set forth specific facts.[7]

"[W]e must view the record in a light most favorable to the parties opposing the motion for summary judgment."[8]  Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative.[9]  Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."[10]

## C.    Discussion

### 1.    Constitutional Violation:  Deliberate Indifference

Conditions of prisoner confinement create an obligation on the state to provide adequate health care for a prisoner.[11]  In light of this duty, the Tenth Circuit has held that "[a] prison official's deliberate indifference to an inmate's serious medical needs violates the Eight Amendment."[12]  Not all failures to provide health care, however, rise to the level of a constitutional violation. In order to state a cognizable claim, a prisoner must allege acts or omissions by the prison official sufficiently harmful to evidence

---

[6]*Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990).

[7]*Id.*

[8]*Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.*, 938 F.2d 1105, 1110 (10th Cir. 1991).

[9]*Anderson*, 477 U.S. at 250-51.

[10]*Id.*

[11]*Estelle v. Gamble*, 429 U.S. 97, 103 (1976).

[12]*Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000).

deliberate indifference to serious medical needs.[13]  In the case of a supervisor, the supervisor may be held

liable in his or her individual capacity under § 1983 for the actions of a prison official subordinate only if

the supervisor participated or acquiesced in the constitutional violation of the prisoner.[14]

"Deliberate indifference" is analyzed according to an objective and subjective component.[15]  Under

the objective component, deliberate indifference occurs if the deprivation is of a sufficiently serious nature,

which the Tenth Circuit has held is "one that has been diagnosed by a physician as mandating treatment."[16]

Under the subjective component, Plaintiff must establish that the "defendant(s) knew he faced a substantial

risk of harm and disregarded that risk, by failing to take reasonable measures to abate it."[17]

### a.    Objective Component

As for the objective component, Defendants in this case readily acknowledge that Plaintiff's

glaucoma is a serious medical condition. Defendants were first put on notice of Plaintiff's serious condition

June 12, 2001, when Plaintiff was diagnosed by Dr. Murphy with glaucoma and photophobia, followed

by correspondence from Dr. Murphy outlining the condition, its risks and treatment and a call regarding

setting up an appointment for Plaintiff. Defendants were again put on notice of the seriousness of Plaintiff's

condition when Plaintiff subsequently was seen by Dr. Griffith, who diagnosed plaintiff with bilateral chronic

open angle glaucoma with optic disc cupping, and noted in his reports that Plaintiff was at risk of suffering

---

[13]*Estelle v. Gamble*, 429 U.S. at 106.

[14]*Meade v. Grubbs*, 841 F.2d 1512, 1527 (10th Cir. 1988).

[15]*Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Sealock*, 218 F.3d at 1209.

[16]*Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999).

[17]*Id.* (quotation omitted).

a marked decreased in vision and had "extensive" optic disc cupping. The regularity of appointments requested by Dr. Griffith, together with the medication changes and fluctuating pressure measurements, further evidences the seriousness of Plaintiff's condition and Defendants' awareness of such condition. Based on these facts, the Court finds the condition and subsequent serious risks meet the objective component of the §1983 claim.   Accordingly, the Court will proceed to analysis of the subjective component.

### b.        Subjective Component

Plaintiff has provided evidence of Defendants' knowledge of his eye disease, as well as Defendants' knowledge of Dr. Griffith's directive that eye drops be administered daily and that Plaintiff's condition be closely monitored due to the potential for irreversible loss of vision if not properly treated.   Although Defendants do not dispute any of this subjective knowledge, they vehemently dispute Plaintiff's allegations of deliberate indifference towards Plaintiff's medical condition and argue the "undisputed medical records" "conclusively establish" that Defendants timely and sufficiently addressed each and every one of  Plaintiff's admittedly serious medical needs.        The Court is not persuaded by Defendants' arguments.  As a preliminary matter, Defendants completely ignore the fact that Plaintiff has submitted evidence that contradicts the medical records offered by Defendants in support of summary judgment; accordingly, the records to which Defendants cite do not "conclusively establish" any facts.   When viewed in a light most favorable to Plaintiff – as required in ruling on a motion for summary judgment – the Court finds there is evidence from which a jury could find that Defendants knew of the risks associated with Plaintiff's serious medical condition and deliberately disregarded those risks by intentionally delaying and/or denying access to medical care that has been prescribed by qualified medical doctors.

Notably, deliberate indifference may be manifested by prison doctors' responses to the prisoners' needs or by guards' intentional delay or denial of access to medical care that has been prescribed.[18] "Deliberate indifference in this context does not require proof of an intent to inflict pain nor a detailed inquiry into the officials' state of mind, but the officials' conduct or lack of conduct must demonstrate a knowing indifference to serious medical needs."[19]  "A deliberate refusal on the part of prison officials to provide an inmate with prescribed medication may demonstrate such deliberate indifference."[20]

As evidence of Defendants' intentional delay and denial of access to prescribed medical care, Plaintiff asserts that at his June 12, 2001 eye examination, Plaintiff received a prescription for glasses, including tint for relief from photophobia, but Defendant Butler waited two months before ordering the glasses, despite Plaintiff's complaints of eye pain.

Moreover, although Plaintiff finally received the eye glasses prescribed after three months, the glasses were not tinted as recommended in the prescription. Plaintiff complained that the prescription was not filled as prescribed and, despite Plaintiff's further complaints of eye pain with light and his subsequent need to remain inside rather than participate in outside activities, Defendant Butler did not contact Dr. Murphy to clarify the order for tint.

---

[18]*Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999) (citing *Estelle*, 429 U.S. at 104-06).

[19]*O'Bryan v. Sedgwick County*, No. 98-3308-JTM, 2000 WL 882516, at *6 (D. Kan. June 12, 2000 (citing *Hines v. Wilkinson,* No. 94-3289, 1994 WL 419563, at *3 (6th Cir. Aug. 10, 1994) (citations omitted)).

[20] *Id.* (citing *Hines v. Wilkinson,* 1994 WL 419563, at *3; *Wagner v. Smith*, No. C 92-0773 BAC, 1994 WL 377798, at *2 (N.D. Ca. June 29, 1994) (finding that inmate stated a claim for deliberate indifference to serious medical needs because he had repeatedly complained of pain but was denied his prescription medication)).

13

Defendant Butler testified in her deposition that if a patient ever approached her with a question that she could not answer, Defendant Butler either researched the issue, consulted a person who could provide the answer, or referred the patient to an individual who could provide the patient with a timely answer.  Sometime prior to September 2001, however, Plaintiff asked Defendant Butler for assistance in interpreting the physician's instructions regarding caring for and treating his condition.  Notwithstanding her knowledge that Plaintiff was suffering from glaucoma, a serious medical condition, Defendant Butler refused to assist Plaintiff and told him to wait until his next eye appointment to ask the physician himself.  When Plaintiff subsequently sought out an answer from another individual within the health clinic, Plaintiff was told by Defendant Butler that he was not to seek assistance from anyone in the clinic other than Defendant Butler.

Plaintiff was seen by Dr. Griffith again on August 23, 2001. Dr. Griffith asked Plaintiff if he had been taking the eye drops, and Plaintiff informed Dr. Griffith that he had not received his eye drops as prescribed.  Defendant Butler, upon learning of Plaintiff's statement to Dr. Griffith that he had not received his prescription eye drops, contacted Dr. Griffith and accused Plaintiff of lying.   Dr. Griffith provided Plaintiff with a sample of the prescribed eye drops at the August 23, 2001 appointment.

From the end of August 2001 to the end of July 2003, the facility clinic staff administered the prescribed eye drops.  During this time period, Plaintiff was absent from the medication line, as noted by the "A" on the monthly medication administration records, because his medication supply had been depleted and the reorder not yet placed and/or received or because Plaintiff had not been informed that the reordered medication had arrived at the facility.

14

On October 12, 2001, Plaintiff presented himself for dispensation of his eye drops and noticed that, although new, the seal on the bottle had been broken and the bottle of medication to did not resemble the prior bottles of medication.  Out of fear of either receiving medication other than that prescribed, receiving contaminated medication, or using an eye drop dispenser used by someone else that could cause some sort of an eye infection, Plaintiff refused to receive the medication until a reasonable explanation was provided. Plaintiff made an inquiry on October 13, 2001 with respect to the discrepancy in the appearance of the bottle presented on October 12, 2001 and was told that he would not receive any other or additional medication for thirty days if he did not take the medication presented.  In an effort to resolve the discrepancy, Plaintiff sought the assistance of defendant Couch, Unit Team Counselor, on October 15, 2001.   Plaintiff received a written response on October 15, 2001 from Prison Health Services staff indicating the medication was the proper medication and had not been tampered with.  Plaintiff received a similar response from Defendant Couch on October 23, 2001. By virtue of the discrepancy in the appearance of the medication, the broken seal and the delay of time in receiving an explanation, Plaintiff did not receive his medication from October 12 through October 15, 2001.

At some time between mid-October and mid-November, Plaintiff learned from the optometry assistant that it was Defendant Butler who made the decision to disregard the suggestion within the prescription to tint Plaintiff's glasses.   Soon thereafter, Plaintiff was called out for an appointment with the optometry assistant, who informed Plaintiff that she would not document Defendant Butler's conduct for fear of getting into trouble.  During the discussion between Plaintiff and the optometry assistant, Defendant Butler entered the room and instructed Plaintiff to direct all questions to Defendant Butler and not the facility

optometry assistant.  Plaintiff was informed by Defendant Butler that further action would be taken against him if he disregarded this directive.

During the relevant time, Defendant Couch was the Unit Team Counselor with responsibility for Plaintiff.  After Defendant Butler told Plaintiff he was prohibited from contacting anyone in the clinic other than herself for assistance, Defendant Couch personally warned Plaintiff that Couch would charge Plaintiff with stalking if Plaintiff ever attempted to seek assistance from anyone in the clinic again.

When responding to Plaintiff's grievance, Plaintiff asserts Defendant Roberts untruthfully denied the clinic had run out of Plaintiff's prescription eye drops and then falsely asserted Plaintiff did not show up to take his eye drop medications on the days in question and thus must "take responsibility" for his own condition.  As noted above, Plaintiff maintains the real reason for his absences in the medicine line were depletion of his medicine and a failure by Defendants to timely reorder or a failure by Defendants to inform him that a new shipment of the medicine had arrived.

Likewise, there is evidence that Defendant Cummings knew of Plaintiff's serious medical condition and subsequently disregarded the risks associated with it. Specifically, Defendant Cummings indicated in his October 26, 2001 grievance response that Plaintiff's complaints were unfounded and the medications were available but were refused by Plaintiff.

Viewing all of these facts in a light most favorable to Plaintiff, there is evidence from which a jury could find that all named individual Defendants caused delay and interfered with Plaintiff's prescribed treatment.  If proven, such acts – and omissions – constitute deliberate indifference to Plaintiff's serious eye condition in violation of the Eighth Amendment. As to the second element, Plaintiff also presents sufficient evidence from which a jury could find that the individual Defendants knew Plaintiff's condition was serious

16

and thus any delay or denial would violate Plaintiff's constitutional rights.  This includes supervisory Defendants Roberts and Cummings, whose actions and inactions – as alleged by Plaintiff – demonstrate personal participation and/or acquiescence in the constitutional violation.[21]

## 2.    Qualified Immunity

Defendants next argue they are entitled to summary judgment on the basis of qualified immunity. The Court does not agree.

When performing discretionary functions, government officials are entitled to qualified immunity; in other words, such government officials are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[22]  Once the defendant has properly raised the defense of qualified immunity in a summary judgment motion, the court applies a two-part framework.[23]  First, the plaintiff must show the defendant's conduct violated a constitutional right; second, the plaintiff must show the right the defendant's conduct violated was clearly established such that a reasonable person in the defendant's position would have known the conduct violated the right.[24]  In considering whether the plaintiff makes such a showing, the court views the evidence in the light most favorable to the plaintiff.[25]

---

[21]*Meade v. Grubbs*, 841 F.2d at 1527.

[22]*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

[23]*Garramone v. Romo,* 94 F.3d 1446, 1449 (10th Cir. 1996).

[24]*Id*.; *Anderson v. Creighton*, 483 U.S. 635, 638-40 (1987).

[25]*Davis v. Gracey*, 111 F.3d 1472, 1478 (10th Cir. 1997);

17

Given the Court's finding that Defendants' affirmative conduct and omissions as alleged could be found by a jury to violate Plaintiff's constitutional rights, the question presented on the issue of qualified immunity is whether "the right . . . violated was clearly established such that a reasonable person in Defendants' position would have known the conduct violated the right."[26]

To that end, the Court finds it is clearly established that "deliberate indifference to serious medical needs of prisoners," such as has been alleged here, "constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment."[27] The Court further finds reasonable persons in Defendants' positions would have known this. Accordingly, the Court concludes that Defendants are not entitled to summary judgment on a defense of qualified immunity.

### 3.    Absolute Immunity

Finally, Defendants move for summary judgment with respect to Plaintiff's claims against Defendant Werholtz in his official capacity.  In support of this argument, Defendants argue that Werholtz, in his official capacity, is immune from suit under the Eleventh Amendment to the United States Constitution.

The Eleventh Amendment states that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."[28]  Eleventh Amendment

---

[26]*Lawmaster v. Ward*, 125 F.3d 1341, 1347 (10th Cir. 1997).

[27]*Estelle*, 429 U.S. at 104 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)).

[28] U.S. CONST. amend. XI.

immunity also extends to state officials who are sued in their official capacity.[29]  Such suits are tantamount to suits directly against the state, since plaintiff seeks monetary damages that would be paid out of the state's treasury.[30]

Notably, however, Plaintiff does not seek monetary damages in his Amended Complaint from Defendant Werholtz; Defendant Werholtz is sued in his official capacity for the sole purpose of seeking injunctive relief.  "[N]either qualified nor absolute immunity precludes prospective injunctive relief except in rare circumstances not relevant here."[31]

Plaintiff alleges his eye conditions are permanent and progressive, and he reasonably expects to require continuing medical service when necessary and appropriate.  To that end, Plaintiff requests relief in the form of an injunction preventing Defendant Werholtz from causing or permitting any obstruction or delay with regard to Plaintiff's continuing serious medical needs and requiring Werholtz to provide such further medical care and treatment as Plaintiff reasonably requires.  Because the Eleventh Amendment does not shield claims for prospective injunctive relief, Defendant Werholtz is not entitled to summary judgment on his defense of absolute immunity.

---

[29]*Kentucky v. Graham,* 473 U.S. 159, 165 (1985); *Searles v. VanBebber*, 993 F.Supp. 1350, 1353 (D. Kan. 1998), *aff'd in part and vacated in part on other grounds*, 251 F.3d 869 (10th Cir. 2001), *cert. denied*, 536 U.S. 904 (2002).

[30]*Kentucky v. Graham*, 473 U.S. at 165.

[31]*Lemmons v. Law Firm of Morris and Morris*, 39 F.3d 264, 267 (10th Cir. 1994) (citations omitted) ("A prosecutor may not simply raise the shield of official immunity and continue to act in an unconstitutional manner without fear of judicial orders to the contrary." (citation omitted)).

Accordingly, it is hereby ordered that the Motion for Summary Judgment filed by the five correctional defendants (doc. 138); and the Motion for Partial Summary Judgment filed by the five correctional defendants (doc. 167) are denied.

IT IS SO ORDERED.

Dated in Kansas City, Kansas on this 29th day of March, 2005.

s/ David J. Waxse
David J. Waxse
United States Magistrate Judge

cc:     All counsel and *pro se* parties

20