DJW/bh

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

KENNETH R. SELLERS,

                              Plaintiff,

                                                      CIVIL ACTION

v.

                                                      No. 02-3055-DJW

DEBORAH BUTLER, et al.,

                              Defendants.

### MEMORANDUM AND ORDER

Plaintiff Kenneth Sellers brings this action pursuant to 42 U.S.C. § 1983, alleging that Defendants, acting under the color of law, were deliberately indifferent to his serious medical needs while he was in the custody of the Kansas Department of Corrections ("KDOC").[1]  Plaintiff claims that Defendant's alleged deliberate indifference violated his Eighth Amendment right to be free from cruel and unusual punishment.  Plaintiff also brings a claim for breach of contract against Prison Health Services, Inc., ("PHS"), asserting that  he was a third-party beneficiary of a contract between PHS and KDOC, and that PHS breached that contract by failing to provide him adequate medical care.

Plaintiff, who was diagnosed with glaucoma and photophobia while in the custody of KDOC, claims that Defendants were deliberately indifferent to his glaucoma and photophobia when they allegedly (1) delayed in providing him tinted lenses for his eyeglasses, and (2) failed to provide him with his prescribed eye drops for extended periods of time.  He seeks compensatory damages for

_____

[1]The parties have consented to magistrate jurisdiction pursuant to 28 U.S.C. § 636(c).

claimed damage to his optic nerve, a decrease in his peripheral visual field, and the advancement

of his glaucoma.  He also seeks punitive damages and damages for claimed mental anguish.

Pending before the Court is PHS' Motion for Summary Judgment (doc. 224).  PHS asserts

it is entitled to summary judgment on Plaintiff's § 1983 claims because they are barred by the statute

of limitations.  PHS also maintains it is entitled to summary judgment on the §1983 claims because

Plaintiff has not presented sufficient evidence supporting his claim that PHS acted with deliberate

indifference to his serious medical needs.  Finally, PHS asserts that it is entitled to summary

judgment on Plaintiff's breach of contract claim because Plaintiff received "not only adequate, but

extraordinary, care for his medical condition."[2]

For the reasons set forth below, the Court grants the Motion for Summary Judgment as to

Plaintiff's § 1983 claims but denies it with respect to Plaintiff's breach of contract claim.

## I.      Uncontroverted Facts

The following facts are uncontroverted or, if disputed, are viewed in a light most favorable

to Plaintiff.  Where necessary, the Court has set forth its reasoning used to determine whether a fact

is uncontroverted.[3]

1.      Plaintiff was in the custody of the Ellsworth Correctional Facility ("ECF"), a KDOC

facility, from June 5, 2001 to July 29, 2003.  On July 29, 2003, he was moved to the Hutchinson

Correctional Facility, and remained there until February 24, 2004, at which time he was paroled to

a detainer and left the KDOC.

---

[2]PHS' Mem. in Supp. of Mot. for Summ. J. (doc. 225) at p. 11.

[3]The Court notes that it asked the parties to submit supplemental briefing in an order dated
April 23, 2007.  Plaintiff filed a supplemental brief on May 9, 2007; however, PHS did not file a
supplemental brief.

2.      PHS is a corporation under contract with KDOC to provide medical care and treatment, including eye care, to inmates.  If an inmate's medical condition warrants it, PHS arranges for the inmate to be seen by outside providers.

3.      At all times relevant to this lawsuit, Defendant Deborah Butler was an employee of KDOC and was the Director of Nursing for PHS at ECF.

4.      During the relevant time period, PHS employees were directly involved in Plaintiff's ongoing medical care and were responsible for scheduling his appointments with off-site doctors.

5.      On June 12, 2001, Plaintiff was seen by an outside optometrist, Dr. Robert Murphey, for a routine eye examination.  Dr. Murphey diagnosed Plaintiff with glaucoma.  Dr. Murphey noted in his record that Plaintiff complained of light sensitivity (photophobia).

6.      Glaucoma is a group of diseases in which the pressure in the eye is higher than that particular eye can tolerate.  A higher than normal pressure causes damage to optic nerve at the retina.  Loss of sight may occur gradually or, in rare cases, suddenly if the glaucoma is not controlled.  If glaucoma is discovered early, treatment usually keeps it from worsening.

7.      During the June 12, 2001 appointment Dr. Murphey referred Plaintiff to an ophthalmologist, Dr. Frank Griffith, for glaucoma management.

8.      Also during that appointment, Dr. Murphey prescribed glasses for Plaintiff.  On his report, Dr. Murphey wrote:  "Suggest Gradient Tint to Relieve Photophobia."  Plaintiff does not dispute that Dr. Murphey used the term "suggest" with respect to the gradient tint.  In fact, Plaintiff relies on the affidavit of Dr. Murphey, in which he expressly states that "affiant referred Mr. Sellers

to Dr. Griffith for glaucoma management, *prescribed glasses, and suggested gradient tint to the lenses* to relieve the symptoms of photophobia."[4]

9.      According to Dr. Murphey, if a "recommendation" is made an actual part of a prescription, the prescription must be filled with the recommendation and cannot be filled differently.  If, however, the term "suggest" is used, it is not deemed part of the prescription.  Dr. Murphey uses the word "suggest" with respect to some treatments so as to provide the client the option to either follow the suggestion or refuse it and still have the prescription filled.

10.      Dr. Murphey was not sure whether KDOC allowed inmates to wear darkened or tinted lenses.  He therefore wrote the prescription for eyeglasses with the "suggestion" that the lenses be tinted.  He did not prescribe that the lenses be tinted.[5]

11.      No one at ECF or with PHS contacted Dr. Murphey about the prescription to determine whether tinted lenses should have been made part of the prescription.

12.      Dr. Griffith testified in his deposition that tinted eyeglasses make individuals with photophobia "more comfortable" in brightly lit situations, but that "light sensitivity is not going to damage their vision."

13.      An appointment was made for Plaintiff to see Dr. Frank Griffith on July 31, 2001.

14.      PHS states in its Uncontroverted Statement of Fact No. 4 that the eyeglasses prescribed by Dr. Murphey were not ordered immediately due to the upcoming appointment with

---

[4] *See* ¶5, Murphey Aff., attached to Pl.'s Resp. (doc. 262) as Ex. A (emphasis added).

[5] Dr. Murphey states in his affidavit that had he known that, pursuant to KDOC policy, any treatment "suggested" by a provider would not be provided, he would have made tint part of the prescription.  The Court does not find this fact to be material, as PHS could have no knowledge of Dr. Murphey's state of mind or unstated intentions.  PHS could only rely on what Dr. Murphey communicated to it and what was stated in the prescription and related medical reports.

Dr. Griffith on July 31, 2001.  Plaintiff, in his response, attempts to controvert this statement, pointing to the affidavit of Dr. Murphey.  However, nothing in Dr. Murphey's affidavit pertains to *when* the eyeglasses were ordered, nor does it indicate any reason why the eyeglasses were not ordered at the time Plaintiff saw Dr. Murphey.  The Court therefore finds it uncontroverted that the reason PHS did not order the eyeglasses prescribed by Dr. Murphey immediately following Plaintiff's appointment with Dr. Murphey was because Plaintiff was scheduled to see Dr. Griffith on July 31, 2001.

15.     Plaintiff was examined by Dr. Griffith on July 31, 2001.  Dr. Griffith confirmed that Plaintiff had glaucoma.  More specifically, he diagnosed Plaintiff as having "bilateral chronic open angle glaucoma with advanced optic disc cupping."  Dr. Griffith prescribed Xalatan, a type of medicated eye drops, for Plaintiff.  Dr. Griffith wrote in his report in the section entitled "Orders/Recommendations":  (1) Start Xalatan . . . (2) gave Pt Rx for Bifocal glasses (3) Rec[heck] IOP 3 wks."  ("IOP" is the acronym for intraocular pressure.)

16.     The eyeglass prescription Dr. Griffith wrote at Plaintiff's July 31, 2001 appointment was "stronger" than the prescription written by Dr. Murphey.  The prescription form completed by Dr. Griffith contained a box for "Tint."  That box was left blank.  In addition, there is no mention of tint anywhere in Dr. Griffith's report of the July 31 evaluation. The Court therefore finds its uncontroverted that Dr. Griffith did not prescribe, recommend, or even suggest that Plaintiff's lenses be tinted.[6]

---

[6]PHS asserts in its Uncontroverted Statement of Fact No. 5. that Dr. Griffith, "like Dr. Murphey, did not prescribe that the lenses be tinted." In response, Plaintiff merely states: "Controverted.  Dr. Murphey did prescribe tinted lenses despite his use of the word "suggest.'" Plaintiff does not provide any evidence to dispute the statement that *Dr. Griffith* did not prescribe that the lenses be tinted.  And nothing in the record shows that Dr. Griffith prescribed, suggested,

(continued...)

17.     On July 31, 2001, Plaintiff was seen by an optician and measured for eyeglasses. Defendant Butler ordered the glasses that same day.  She ordered the lenses without any tint, as tint was not part of Dr. Griffith's prescription.  Plaintiff was informed that he could purchase clip-on sunglasses at the canteen.

18.     The medicated eye drops prescribed by Dr. Griffith on July 31, 2001 were not formulary for ECF, i.e., they were not normally kept in stock at ECF.  PHS therefore had to submit a "formulary exception" for Plaintiff to receive the medication.  The formulary exception process is as follows: (a) a PHS employee or agent fills out a form stating who prescribed the medication, the name of the medication, and the prescription, including dosage, strength and length of time; (b) the form is submitted to PHS' Regional Medical Director who reviews it; and (c) if the formulary exception is approved, the Regional Medical Director places the order.

19.     A formulary exception for Plaintiff's medicated eye drops was submitted to PHS' regional office via fax on July 31, 2001, the same day the eye drops were prescribed by Dr. Griffith. The request was approved by the regional office the following day, on August 1, 2001.

20.     ECF received the eye drops on August 4, 2001.

21.     Plaintiff did not receive his eye drops on August 4, 2001, even though they were available.  According to PHS, the reason Plaintiff did not receive his eye drops on August 4 was because Plaintiff failed to come to the medication line to obtain them.  Plaintiff agrees that the drops arrived at ECF on August 4, but states in response to PHS' Statement of Uncontroverted Fact: "Plaintiff controverts the facts alleged to the extent that it [sic] implies that Plaintiff knew that drops

---

[6](...continued)
recommended, or even discussed tinted lenses for Plaintiff's eyeglasses.

were available."[7]  Plaintiff, however, cites to nothing in the record to support his assertion that he did not know the drops were available.  The Court has reviewed the deposition testimony submitted and Plaintiff's affidavit and finds there is nothing there addressing this issue.  Consequently, the Court finds it uncontroverted that Plaintiff failed to come to the medication line on August 4, 2001 to receive the eye drops.

22.     On August 1, 2001, PHS at ECF submitted an Outpatient Referral Request Form to PHS' regional office so that Plaintiff could be seen by Dr. Griffith for the recommended three-week follow-up appointment.  PHS approved the request, and PHS made an appointment for Plaintiff to see Dr. Griffith on August 23, 2001.

23.     Beginning on August 5, 2001, Plaintiff was permitted to self-administer his eye drops.  Plaintiff received his eye drops on a daily basis from August 5 to August 20, 2001.  On August 21, Plaintiff ran out of the eye drops.  PHS states in its Fact No. 8 that Plaintiff failed to administer them properly and therefore depleted them prematurely on August 21.  Plaintiff attempts to controvert this  asserting by stating that he had been given a sample-size container of eye drops that did not even contain a month's worth of eye drops. In support, he cites to his affidavit.  Nothing in his affidavit, however, supports that assertion.  The Court therefore finds it uncontroverted that Plaintiff prematurely depleted the drops on August 21, 2001.

24.     The eye drops were re-ordered on August 21, 2001, the same day they had run out, and were received at ECF on August 23, 2001.  Plaintiff resumed using the eye drops on that day. Consequently, Plaintiff was without his eye drops for approximately two days.

---

[7]Pl.s' Am. Resp. to PHS' Mot. for Summ. J. (doc. 262), at p. 3, Fact No. 7.

25.     Plaintiff was seen again by Dr. Griffith on August 23, 2001.     Dr. Griffith reconfirmed the glaucoma diagnosis.     Under the section of his record entitled "Orders/Recommendations" Dr. Griffith wrote: "(1)  Continue Xalatan . . . Refill PRN.  Pt is at high risk to suffer marked decrease vision if IP not controlled to target level mid to low teens.  (2) Rec[heck] IOP 6 wks while using Xalatan.  (3)  Get eyeglass RX from 7/31/01."

26.     Shortly after Plaintiff's August 23, 2001 appointment with Dr. Griffith, PHS scheduled the six-week follow-up appointment recommended by Dr. Griffith.  The appointment was made with Dr. Griffith for October 9, 2001.

27.     Although Plaintiff was allowed to self-medicate using the eye drops, he was still required to come to the medication line to receive the bottle of eye drops.  The daily Inmate Medication Records reveal that Plaintiff was absent from the medication line and therefore did not use his medicated eye drops on August 30 and 31, and on September 1, 2, 5, 16, 20, and 23, 2001. Taking the facts in the light most favorable to Plaintiff, Plaintiff was absent from the medication line because the medication was either not available or Plaintiff was unaware that the medication was available.

28.     Plaintiff filed a grievance with prison officials on September 3, 2001, complaining about the length of time it took to receive his eyeglasses and the fact that the glasses he received on September 6, 2001 were not tinted.  Defendant Ray Roberts, the ECF Warden, responded to the grievance as follows:  Plaintiff had been seen by two different doctors three times between June 12, 2001 and September 3, 2001, which, on average, was an appointment with the eye doctor approximately every twenty days.  Warden Roberts explained that additional appointments would be arranged for Plaintiff as prescribed the physician.  He also stated that "Dr. Murpy [sic] has

8

suggested (not prescribed) gradient tint lenses, but Dr. Griffith (the Optimologist) [sic] determined that dark glasses were not a medical necessity.  The state will not provide custom tinted lenses that are not a medical necessity."

29.    On September 6, 2001, Plaintiff received the eyeglasses that Dr. Griffith had prescribed for him on July 31, 2001 and that had been ordered for him on that same date.  Plaintiff accepted the eyeglasses but refused to sign for them because they were not tinted.  Defendant Butler informed Plaintiff that tint was not required by the prescription and that tinted eyeglasses would not be ordered for him.

30.    On October 12, 2001, Plaintiff received a new bottle of medicated eye drops, but would not accept them because the container did not look like the previous container and the bottle had already been opened.  Plaintiff did not want to use the eye drops until the discrepancy was explained.  Plaintiff received a written response on October 15, 2002 from PHS staff indicating the medication was the proper medication and had not been tampered with.  The Daily Inmate Medication Records contain a reference to a new bottle of eye drops being received on October 12, 2001, but the records do not indicate that Plaintiff missed taking his eye drops from October 12 -15, 2001, or that he was deprived the opportunity to take them during that period.  Nor does Plaintiff assert in his statement of uncontroverted facts that he did not receive his eye drops during that four-day period.

31.    On October 9, 2001, Plaintiff saw Dr. Griffith for a follow-up evaluation and IOP check.  Dr. Griffith wrote in the section of his report entitled "Orders/Recommendations" that Plaintiff was to continue taking the medicated eye drops and to return in six weeks for a follow-up

visit. Dr. Griffith made no comments in his written report about Plaintiff's new eyeglasses or their lack of tint. Dr. Griffith recommended that Plaintiff be seen again in six weeks.

32.     Shortly after the October 9, 2001 appointment, PHS scheduled, pursuant to Dr. Griffith's recommendation, a six-week follow-up appointment with Dr. Griffith. The appointment was made for November 20, 2001. Dr. Griffith's office cancelled the November 20 appointment but rescheduled it for November 26.

33.     On November 5, 2001, Plaintiff received a pair of tinted "outside" eyeglasses. Plaintiff accepted the eyeglasses. Plaintiff concedes in Fact No. 45 of his Statement of Additional Materials Facts that these "tinted outside glasses . . . were first recommended by the optometrist [Dr. Murphey] on June 12, 2001."[8] It would appear then that Plaintiff does not controvert that these eyeglasses were different than what Dr. Murphey had suggested at the June 12, 2001 appointment.

34.     Dr. Griffith saw Plaintiff again on November 26, 2001. Dr. Griffith's report of that appointment revealed the following: Under the section entitled "Diagnosis," Dr. Griffith wrote: "Chronic open angle glaucoma R>L Not controlled [with] present meds." Under the section entitled "Order/Recommendations," he wrote: "Have eyeglass lenses tinted for medical reason of photophobia." Under that same section he also wrote that Plaintiff was to discontinue using the Xalatan eye drops and start using Cosopt eye drops in each eye two times per day. He also recommended that Plaintiff return in two months for a recheck of his IOP.

35.     During the November 26, 2001 appointment, Dr. Griffith wrote a prescription for new bifocal lenses for Plaintiff. The prescription directed: "Use Rose Tint #2 in distance portion of Rx — tint for medical reason of photophobia."

---

[8]Pl.s' Am. Resp. to PHS' Mot. for Summ. J. (doc. 262), at p. 7, Fact No. 45.

36.     Following his November 26, 2001 appointment with Dr. Griffith, Plaintiff began receiving the Cosopt eye drops twice a day.  The Inmate Medication Records reveal that Plaintiff received the eye drops twice daily as prescribed by Dr. Griffith, with the exception that Plaintiff was absent from the medication line on the mornings of December 2, 13, and 25, 2001.  Taking the facts in the light most favorable to Plaintiff, Plaintiff was absent from the medication line because the eye drops were either not available or Plaintiff was unaware that the drops were available.

37.     On January 4, 2002, Plaintiff received the lenses that Dr. Griffith had prescribed for him on November 26, 2001.  The lenses were tinted with the rose tint, as prescribed by Dr. Griffith.

38.     Plaintiff continued to receive the prescribed Cosopt eye drops twice a day.  However, Plaintiff was  absent from the medication line the morning of January 20, 2002. Taking the facts in the light most favorable to Plaintiff, Plaintiff was absent from the medication line that morning because the medication was either not available or Plaintiff was unaware that the medication had arrived at the facility.

39.     Plaintiff was seen by Dr. Griffith for a follow-up examination on January 24, 2002. Dr. Griffith reported that Plaintiff's glaucoma was controlled with medication.  Dr. Griffith wrote another new prescription for Plaintiff for bifocal lenses with a rose tint.  He recommended that Plaintiff be rechecked in four months.  There is nothing in the record indicating whether Plaintiff received these new lenses; however, this pair of lenses does not appear to be at issue in this case.

40.     After his January 24, 2002 appointment with Dr. Griffith, Plaintiff continued to receive the prescribed Cosopt eye drops twice a day through early June 2002, when he was seen by Dr. Griffith again.  During that period, the medication records reveal that Plaintiff was  absent from the medication line only once, on the morning of April 13, 2002.  Taking the facts in the light most

favorable to Plaintiff, Plaintiff was absent from the medication line because the medication was either not available or Plaintiff was unaware that the medication had arrived at the facility.

41.     Plaintiff was seen by Dr. Griffith again on June 6, 2002.  Dr. Griffith found that Plaintiff's IOP was not controlled.  He therefore ordered that the Xalatan eye drops be resumed and be used in conjunction with the Cosopt eye drops.  He recommended that Plaintiff's IOP be rechecked in two months.        42.        Thereafter, Plaintiff continued to receive the Cosopt eye drops twice daily.  In addition, On June 11, 2002, shortly after his June 6, 2002 visit to Dr. Griffith, he started receiving the prescribed Xalatan eye drops once daily.

43.     Plaintiff was seen two months later by Dr. Griffith on August 5, 2002.  Dr. Griffith reported that Plaintiff's glaucoma was controlled and ordered that Plaintiff continue taking the same medicated eye drops.  He ordered that Plaintiff's IOP be rechecked in three months.  The Inmate Medication Records reveal that over the next four months, Plaintiff continued to receive the Cosopt and Xalatan eye drops as prescribed by Dr. Griffith.

44.     Plaintiff saw Dr. Griffith again on December 3, 2002.  The parties have not submitted any records or details about this visit.  Also, no Inmate Medication Records were submitted for the month of December 2002.  However, Plaintiff makes no specific allegations about not receiving his eye drops in December 2002.  The Court therefore assumes that Plaintiff received his eye drops as prescribed during the month of December 2002.

45.     The Daily Inmate Medication Records for January 1, 2003 through March 5, 2003 indicate that Plaintiff continued to receive the Cosopt and Xalatan eye drops as prescribed.

46.     Plaintiff  was once again evaluated by Dr. Griffith on March 6, 2003.  Dr. Griffith ordered that Plaintiff start using Alphagan-P eye drops in addition to the Cosopt and Xalatan eye

drops.  He also recommended that Plaintiff's IOP and refraction be rechecked in one month. Thereafter, Plaintiff received the Cosopt, Xalatan, and Alphagan-P eye drops as prescribed.

47.    Plaintiff saw Dr. Griffith again on April 8, 2003.  Dr. Griffith wrote in his record of the visit that Plaintiff had "extensive Rt. Optic disc cupping and visual field loss with small change Rt. Eye refraction."  Dr. Griffith prescribed new bifocal lenses.  He ordered that Plaintiff continue taking the same eye drops and recommended that Plaintiff's IOP be rechecked in 4 months.

48.    The parties have not submitted any Daily Inmate Medication Records for the remainder of Plaintiff's incarceration.

49.    On May 13, 2003, Plaintiff was seen by an optician who ordered the new lenses prescribed by Dr. Griffith on April 8, 2003.  As the prescription did not indicate whether tinted lenses were being prescribed, a nurse at ECF contacted  Dr. Griffith's office to clarify whether the lenses were to be tinted.  It was determined that Dr. Griffith recommended a light rose tint for the lenses.  The lenses, with the tint, were ordered that same day.  Although the record is not clear when Plaintiff received them, Plaintiff asserts that he received them on May 14, 2003.

50.    On July 15, 2003, Plaintiff attended the bedtime medication line at the ECF clinic and the nurse determined that Plaintiff was not waiting 5 minutes between eye drops, as prescribed, for his glaucoma, after having been instructed a number of times that the medication would not work unless he waited.  She also determined that Plaintiff had used a month's supply of drops in one week.  The clinic nurse therefore administered the medication rather than allowing Plaintiff to self-medicate.  Plaintiff disputes that he was not waiting five minutes and that he used a month's supply in one week.  However, Plaintiff does not allege that he was deprived of any eye drops during this period.

51.     On July 29, 2003, Plaintiff was transferred to the Hutchinson Correctional Facility. Before his transfer to Hutchinson, Dr. Griffith had recommended a follow-up appointment in early August 2003.  Upon Plaintiff's transfer, PHS staff at the Hutchinson Correctional Facility arranged for Plaintiff to see an optometrist, Dr. Torrence.   Plaintiff was examined by Dr. Torrence on September 11, 2003.  Dr. Torrence determined that Plaintiff's pressure and eyes were doing well.

52.     Plaintiff was seen by a KDOC nurse on October 11, 2003, and her report indicated: "Pt here c/o not getting his eye medication for glaucoma.  Pt eye drops were reordered on the 9th." Plaintiff does not provide any evidence as to how many days he was without medication during this period, and the parties have not provided any Daily Inmate Medication Records for the month of October 2003.  A Formulary Exception Request was submitted for the prescribed eye drops on October 9, 2003.

53.     Plaintiff was re-examined by Dr. Torrence on November 18, 2003, and again Dr. Torrence found that his eyes were doing well.

54.     On or about December 23, 2003, Dr. Torrence referred Plaintiff to Dr. Depenbusch, an opthalmologist, for a glaucoma evaluation.  An appointment was made for the first available opening on January 13, 2004.  That appointment was cancelled, however, due to the fact that the Court granted Plaintiff's request for an examination by Dr. Esther Rettig, which was to take place on January 6, 2004

55.     Dr. Rettig is an ophthalmologist who was designated by Plaintiff as an expert in this case. Dr. Rettig performed a clinical examination of Plaintiff on January 6, 2004.  She also reviewed Plaintiff's prison records relating to his eye conditions, including the records of the medical care provided by the prison.  In addition, she reviewed the records of Dr. Frank Griffith.

14

56.    Dr. Rettig opined in her deposition that none of Plaintiff's providers breached the standard of care in their treatment of Plaintiff's eye condition.  She also testified that Plaintiff had been seen a sufficient number of times by an ophthalmologist.

57.    With respect to the care and medical referrals provided by PHS, Dr. Rettig did, however have three criticisms.  Dr. Rettig's first criticism was that Dr. Torrence, the optometrist who saw Plaintiff on September 11, 2003,  did not document Plaintiff's ocular pressure, but merely stated that the "pressure is okay, recheck four months."

58.    Dr. Rettig's second criticism was that PHS cancelled "the prearranged visit with the ophthalmologist."  Dr. Rettig did not explain what cancelled appointment she was referring to.  The Court assumes she is referring to the decision to cancel Plaintiff's January 13, 2004 appointment with Dr. Depenbusch, as that is the only cancellation noted in the record and is a cancellation over which Plaintiff had filed a grievance.

59.    Dr. Rettig's third criticism was that it appeared that Plaintiff had not received his eye drops some time in October 2003.  She based her criticism on a note in the record, and she testified she was not apprised of the reason why he did not received his eye drops and that she did not know how long a time period Plaintiff was not receiving his drops.

60.    No eye care specialist has ever told Plaintiff that any alleged delay in receiving his medication during the relevant time period caused damage to his eyes.  Plaintiff himself, however, believes that the delay in receiving his medication damaged his eyes.

61.    No expert has opined that there was a breach of the applicable standard of care or that Plaintiff's glaucoma worsened due to any action or inaction of the part of any Defendant, including PHS.  There is no expert testimony in the summary judgment record explaining the current status

of Plaintiff's eye condition or opining that Plaintiff's current eye condition was caused by an action or inaction of any Defendant, including PHS.   Nor is there any evidence in the record about any continued treatment Plaintiff has received for his glaucoma, other that Plaintiff's deposition testimony that he received treatment at a community center after his release from prison and that he received prescription eye drops from the community center.

62.     Plaintiff *alleges* that his "eye condition caused him pain and difficulty seeing." Although this is alleged in paragraph 20 of Plaintiff's Response to Defendant's Statement of Uncontroverted Facts, he does not cite to his affidavit or any authority for this proposition. Plaintiff does state in paragraphs 12 and 13 of his affidavit that because of his photophobia, sunlight caused him pain.  When it was summer and he did not have tinted lenses, he would remain in his cell rather than go outside during the designated  outside activity periods.

63.     Plaintiff was released from the custody of KDOC on February 24, 2004.


II.     **Standard for Ruling on a Summary Judgment Motion**

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law."[9]  In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  A fact is "material" if, under the applicable substantive law, it

---

[9]Fed. R. Civ. P. 56(c).

is "essential to the proper disposition of the claim."[10]   An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[11]

The moving party must initially show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[12]   In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[13]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[14]   The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[15]   Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier

---

[10]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[11]*Adle*r, 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[12]*Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

[13]*Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adle*r, 144 F.3d at 671).

[14]*Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Anderso*n, 477 U.S. at 256; *Celotex*, 477 U.S. at 324)).

[15]*Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

of fact could find for the nonmovant."[16]   To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibits incorporated therein."[17]

Finally, summary judgment is not a disfavored procedural shortcut.  On the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[18]   In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[19]

## III.   Analysis of Plaintiff's  § 1983 Claims

### A.   Plaintiff's Claims

Plaintiff alleges that PHS acted with deliberate indifference to his serious medical needs while he was in the custody of KDOC, in violation of the Eighth Amendment's prohibition against cruel and unusual punishment.  It is well settled that the Eighth Amendment creates an obligation on the part of prison officials to provide adequate health care to inmates.[20]  This standard applies to the denial or delay of access to medical care and to interference with prescribed treatment.[21]

---

[16]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197-98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671).

[17]*Adams*, 233 F.3d at 1246.

[18]*Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[19]*Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

[20]*Estelle v. Gamble*, 429 U.S. 97, 103 (1976).

[21]*Id.* at 104-105.

Plaintiff's deliberate indifference claim is twofold.  First, Plaintiff claims that PHS delayed in providing him with tinted eyeglasses.  Second, Plaintiff claims that he was without his medicated eye drops for extended periods of time.

Plaintiff asserts the following allegations with respect to his eyeglasses:

1.  Plaintiff did not receive the eyeglasses prescribed for him by Dr. Murphey on June 12, 2001, until September 6, 2001, which was eighty-six days after they were originally prescribed.[22]

2.  The eyeglasses Plaintiff finally received on September 6, 2001 were not tinted as Dr. Murphey recommended on June 12, 2001.[23]

3.  PHS "was aware of Plaintiff's concern for the lack of tinted lenses, yet . . . did not seek clarification or further instruction regarding the optometrist's [Dr. Murphey's] June 12, 2001, notation for gradient tint."[24]

4.  "Almost two years elapsed from the date Plaintiff was initially diagnosed [with glaucoma and photophobia] until the prescribed tined lenses were actually ordered."[25]

With respect to his medicated eye drops, Plaintiff alleges the following:

1.  PHS and ECF did not provide Plaintiff with his prescription eye drops in a timely manner, and did not provide him timely notification of their availability, thereby causing his glaucoma to worsen.  The unavailability of eye drops caused plaintiff unnecessary deterioration in his eye condition and an increase in plaintiff's eye pressure.  Plaintiff maintains that he was absent from the medication line on various days because his supply of medication was depleted and Defendants failed to timely reorder the medication or failed to inform him that a new shipment of the medicine had arrived.[26]

---

[22]Pretrial Order (doc. 216), ¶5.a at p. 6 & 7.

[23]*Id.*

[24]*Id.*, at p. 7.

[25]*Id.*

[26]Pl.s' Am. Resp. to PHS' Mot. for Summ. J. (doc. 262), at p. 1.

      2.      Plaintiff specifically asserts that he did not receive his medication from October 12 -15, 2001 because on the 12th he could not accept the new bottle of eyedrops given to him as the seal was already broken, the bottle did not resemble the drops he had been taking, and the administering nurse could not explain the discrepancy. Although Plaintiff filed a request for an explanation of the discrepancy, he did not receive assurance from prison officials that the medication was unused and his same prescription until October 15.[27]

Plaintiff alleges in the Pretrial Order that as a result of the above-described claimed deliberate indifference to his serious medical needs, he "suffered [damage] to his optic nerve, a decrease in his peripheral visual field, advancement of his eye disease, and mental anguish."[28]

**B.    Are Plaintiff's § 1983 Claims Barred by the Statute of Limitations?**

    *1.    The statute of limitations for § 1983 claims*

In actions under 42 U.S.C. § 1983, federal courts apply the state's statute of limitations for personal injury.[29]  Thus, because Kansas' statute of limitations for personal injury is two years,[30] Plaintiff's deliberate indifference claims are subject to a two-year statute of limitations.[31]

Section 1983 claims accrue, for the purpose of the statute of limitations, when the plaintiff

---

[27]*Id.* at p. 11.

[28]*Id.* at p. 17.

[29]*See Wilson v. Garcia*, 471 U.S. 261, 276-78 (1985); *Hunt v. Bennett,* 17 F.3d 1263, 1265 (10th Cir. 1994).

[30]*See* K.S.A. 60-513(a)(4).

[31]*Johnson v. Johnson County Comm'n Bd.*, 925 F.2d 1299, 1300-01 (10th Cir. 1991) (explaining that the court applies the two-year statute of limitations provided by K.S.A. 60-513(a)(4) to § 1983 claims).

knows or has reason to know "of  the existence and cause of injury which is the basis for his action."[32]

2.       *The parties' arguments*

Applying the above framework, PHS argues as follows:  Plaintiff did not sue PHS until February 2, 2004, when Plaintiff filed its First Amended Complaint naming PHS as a party.  To be timely, any § 1983 claims brought against PHS would have had to have accrued on or after February 2, 2002.  With respect to the eyeglasses claim, PHS argues that Plaintiff received the eyeglass with tinted "outside" lenses on November 5, 2001.  Thus, even assuming arguendo that the delay between Dr. Murphey suggesting the tinted lenses on June 12, 2001 and Plaintiff receiving the tinted lenses on November 5, 2001 was actionable, the delay took place prior to the limitations period.  Similarly, any allegations that Plaintiff was denied eye drops during any time periods prior to February 2002 are time-barred.

Plaintiff argues in his response brief that PHS' argument is unavailing for three reasons.  First, Plaintiff argues that the First Amended Complaint should be deemed filed on November 25, 2003, the date the motion to amend was filed.  Thus, the statute of limitations did not begin to run until November 25, 2003.

Second, Plaintiff contends that the "continuing wrong" doctrine (also known as the "continuing violation" doctrine) applies.   Plaintiff explains that the doctrine applies to a series or pattern of continuing wrongful acts and provides that the cause of action does not accrue until the date of the last injury in the series or pattern.  Plaintiff maintains that PHS engaged in a series of

---

[32]*Kripp v. Luton*,466 F.3d 1171, 1175 (10th Cir. 2006) (citations omitted). *Accord Hunt,* 17 F.3d at 1266.

continuing wrongs by delaying in providing him with tinted lenses.  Plaintiff contends that this continuing wrong continued up until May 14, 2003, when he finally received the tinted lenses that were prescribed for him on June 12, 2001.  Thus, Plaintiff argues that, with respect to his tinted lens claim, the statute of limitations did not begin to run until he first received the tinted lenses, which he asserts was May 14, 2003.  Because his First Amended Complaint is deemed filed as of November 25, 2003, his tinted lens claims should be held timely.

Plaintiff does not assert that the continuing violation doctrine applies to his claim relating to his eye drops.

Finally, Plaintiff argues that even if the continuing wrong doctrine does not apply to his eyeglasses claim, the relation-back doctrine set forth in Federal Rule of Civil Procedure 15(c)(3) saves his claim.  If that doctrine applies, Plaintiff's eyeglasses claim against PHS would relate back to the initial Complaint, which was filed on March 5, 2002.  This means the statute of limitations did not begin to run until March 5, 2000.  Clearly, none of alleged misconduct would be deemed time-barred if that is the beginning of the limitations period, as Plaintiff did not begin his incarceration at ECF until June 2001.

PHS counters in its reply brief that the continuing wrong doctrine is not applicable to § 1983 claims.  It also argues that even if the doctrine is applicable it does not save Plaintiff's eyeglasses claim because Plaintiff is mistaken in asserting that he did not receive the tinted lenses until May 14, 2003.  PHS points out that Plaintiff received tinted "outside" eyeglasses on November 5, 2001. Thus, the alleged "continuing wrong," i.e., the delay in providing eyeglasses with the tinted lenses ended on November 5, 2001.  As that was outside the limitations period, the § 1983 claim relating to the eyeglasses is time-barred.  Finally, PHS argues that Rule 15(a)(3)'s relation-back doctrine is

wholly inapplicable because Plaintiff cannot show that either of the two conditions for application of that rule have been met here.

3.    *Analysis*

a.    *Determining the date the action was commenced against PHS*

Plaintiff is correct in asserting that his First Amended Complaint should be deemed filed on the date his motion to amend was filed, that is, on November 25, 2003.  As Plaintiff correctly points out, this Court has held that an action is commenced against an added party, for statute of limitations purposes, on the date the plaintiff files his motion to amend and proposed complaint, regardless of when the motion to amend is granted and the amended complaint is filed.[33]   To hold otherwise would punish the plaintiff for the Court's unavoidable delay in issuing the order granting leave to amend the complaint.[34]   Because Plaintiff filed his motion seeking leave to amend (doc. 97) on

---

[33]*See Koch v. Shell Oil Co.*, 8 F. Supp. 2d 1264, 1268 (D. Kan. 1998) ("Accordingly, the court holds that plaintiff's amended complaints were effectively filed when his motions for leave to file an amended complaint were filed."); *Ramirez v. City of Wichita, Kan.,* No. 92-1437-PFK, 1994 WL 114295, at *3 (D. Kan. Mar. 24,1994) (ruling in § 1983 action that "the filing of a motion to amend is sufficient to toll the statute of limitations and to commence the filing of a civil action as required by Fed. R. Civ. P. 3. . . . [I]f the motion to amend is granted, the suit is deemed filed on the date the motion was filed, not on the date the amended complaint is filed."); *Wallace v. Sherwin Williams Co.,*  720 F. Supp. 158,159 (D. Kan. 1988) ("The court holds that plaintiff's amended complaint was effectively filed when his motion for leave to file an amended complaint was filed . . . .").  *See also Farm Credit Bank of Wichita v. FCB Ltd. P'ship*, 825 F. Supp. 932, 935 (D. Kan. 1993) ("For purposes of the statute of limitations, an amended complaint that adds new parties to a diversity action may be deemed filed on the date the motion to amend is filed, rather than on the date that the plaintiff actually files the complaint after receiving leave of the court to file.").

[34]*See Koch,* 8 F. Supp. 2d at 1268 (quoting *Wallace,* 720 F. Supp. at 159 (D. Kan. 1988)).

November 25, 2003,[35] the Court will deem that to be the date the lawsuit was commenced against PHS.

### b.   Application of the continuing violation doctrine

The Court will now address whether the continuing violation doctrine should be applied to Plaintiff's § 1983 claim relating to Plaintiff's tinted eyeglasses.

The continuing violation theory "is a creation of federal law that arose in Title VII cases" and "recognizes that certain violations are continuing in nature and provides that a claim asserting such a violation is timely if administrative charges are filed within the period applicable to the last act in the continuing series."[36]   To establish a continuing violation, a plaintiff must show that the claimed discriminatory acts that occurred outside the limitations period were sufficiently related to at least one act occurring within the relevant filing period, thereby constituting a continuing pattern of discrimination.[37]

As a preliminary matter, Plaintiff has failed to provide any authority in which the Tenth Circuit has applied the continuing violations doctrine to a §1983 claim.[38]  In *Thomas v. Denny's,*

---

[35] The Court granted the motion on January 30, 2004 (*see* doc. 110) and directed Plaintiff to file his amended complaint within five days of the Court's Order.  Plaintiff timely filed his First Amended Complaint on February 2, 2004.  Thus, for statute of limitations purposes, the Court will deem the First Amended Complaint filed on  November 25, 2003.

[36] *Thomas v. Denny's, Inc*., 111 F.3d 1506, 1513 (10th Cir. 1997).

[37] *Furr v. AT&T Tech., Inc*., 824 F.2d 1537, 1543 (10th Cir. 1987).

[38] *See Hunt at* 17 F.3d at 1266 (declining to determine if continuing violations doctrines applies to § 1983 suits).  *See also Frazier v. Jordan*, No. 06-1333, 2007 WL 60883, at *4 (10th Cir., unpublished, Jan. 10, 2007) (noting that Tenth Circuit has never applied continuing violation theory to § 1983 claims); *Rosewood Servs, Inc. v. Sunflower Diversified*, No. 02-2140-JWL, 2003 WL 22090897, at *14 (D. Kan. Sept. 8, 2003) ("The Tenth Circuit has not decided the precise issue of whether the continuing violation doctrine applies to § 1983 cases.").

*Inc.*,[39] however, the Tenth Circuit rejected the plaintiff's argument that the continuing violation doctrine applies to a claim pursuant to 42 U.S.C. § 1981.[40]  The court reasoned that "the continuing violation theory is a creature of the need to file administrative charges [in Title VII cases], and because a § 1981 claim does not require filing such charges before a judicial action may be brought, the continuing violation theory is simply not applicable."[41]

The Court finds that this reasoning is equally applicable to Plaintiff's § 1983 claims, as Plaintiff was not required to file any administrative charges before filing this lawsuit.[42]  Indeed, this has been the result uniformly reached by judges in this District.[43]  Accordingly, the Court holds that the continuing violation doctrine does not apply to Plaintiff's § 1983 claim relating to his tinted eyeglass lenses.

> c.      *Application of the relation-back doctrine under Rule 15(c)(3)*

---

[39]111 F.3d 1506 (10th Cir. 1997).

[40]*Id.* at 1513-14.

[41]*Id.* at 1514.

[42]*See Rassam v. San Juan College Bd.*, No. 95-2292, 1997 WL 253048, at *3 (10th Cir., unpublished, May 15, 1997) (collecting case law on this issue and noting that courts have been reluctant to apply the continuing violation doctrine outside of the employment discrimination context where the plaintiff is required to file an administrative charge as a prerequisite to filing suit).

[43]*See Trotter v. City of Park City*, No. 05-1311-WEB, 2007 WL 1712815, at *5 (D. Kan. June 12, 2007) (declining to apply the continuing violation doctrine to § 1983 claim); *Rosewood,* 2003 WL 22090897, at *14 (same); *McCormick v. Farrar*, No. 02-2037-GTV, 2003 WL 1697686, at *4 (D. Kan. Mar. 20, 2003) (same), *aff'd,* No. 03-3131, 2005 WL 2083027, at *3 (10th Cir. Aug. 30, 2005) (without deciding whether continuing violation doctrine applies to § 1983 cases, finding that it would not apply under the facts of the case); *Ratts v. Bd. of County Comm'rs*, 141 F.Supp. 2d 1289, 1313 (D. Kan. 2001) (declining to apply the doctrine to § 1983 claim).

Federal Rule of Civil Procedure 15(c)(3) controls whether an amendment that changes the party against whom a claim is asserted relates back to the filing of the original pleading. Rule 15(c) provides:

> An amendment of a pleading relates back to the date of the original pleading when . . .(1) relation back is permitted by the law that provides the statute of limitations applicable to the action, or (2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, or (3) the amendment changes the party or the naming of the party against whom a claim is asserted if the foregoing provision (2) is satisfied and, within the period provided by Rule 4(m) for service of the summons and complaint, the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.[44]

Relation back under 15(c)(3) is dependent on four factors: (1) the claim must have arisen out of the conduct set forth in the original pleading; (2) the party against whom the claim is made must have received such notice that it will not be prejudiced in providing a defense; (3) the party against whom the claim is made must or should have known that but for a mistake of identity, the action would have been brought against the party; and (4) requirements two and three must occur within the prescribed period for service of process, 120 days after the filing of the original complaint under Federal Rule of Civil Procedure 4(m).[45]

The Court holds that factor three has not been met here. For that factor to be satisfied, the plaintiff must show it made a mistake as to the added defendant's identity and that, but for that mistake, the initial complaint would have been filed against that defendant. If the plaintiff knew the

---

[44]Fed. R. Civ. P. 15(c).

[45]*Bloesser v. Office Depot, Inc.*, 158 F.R.D. 168, 170 (D. Kan. 1994).

identity and possible role of the added defendant when he filed his initial complaint, the failure to join the defendant is not deemed a mistake for purposes of the Rule.[46]  On the other hand, a mistake is deemed to occur under the Rule if the plaintiff intended to sue a certain participant, but misidentified or misnamed that person or entity in the original complaint.  In such a case, that person or entity must have known or should have known from reading the complaint that it would have been sued but for the plaintiff' mistake.[47]

Here, Plaintiff does not allege that he made a mistake as to PHS' identity or that he didn't initially sue PHS because of a mistake as to the proper party or proper name of a party.  Rather, as PHS points out, Plaintiff expressly named PHS in the text of the Complaint, and asserted that PHS was the provider of medical services for KDOC and that PHS scheduled certain appointment with his eye doctors.[48]  Plaintiff therefore knew PHS' identity and possible role in the alleged constitutional deprivations when he filed his initial Complaint.  Accordingly, his failure to join PHS at that time cannot be deemed a mistake for purposes of the Rule.  The Court therefore concludes that the relation-back doctrine does not apply.

> d.   *Application of the two-year statute of limitations to Plaintiff's § 1983 claims*

---

[46]*Prime Care of NE Kan., LLC v. Blue Cross & Blue Shield of Kansas City, Inc.,* No. 05-2227-KHV, 2006 WL 2734469, at *3 (D. Kan. Sept.  25, 2006) (citations omitted).

[47]*Id.*

[48]*See* Complaint (doc. 1), p. 5-6.  Specifically, Plaintiff alleged that "ECF contracts its medical services along with all other institutional prison facilities operating in the State of Kansas by the Secretary of Corrections with Prison Health Services (PHS)."  *Id.*  In addition, Plaintiff alleged that PHS scheduled his eye appointments with Dr. Murphey and Dr. Griffith.  *Id.* at p. 6. He also made allegations relating to the actions of the "[n]ursing staff for PHS."  *Id.* at p. 7.

Having determined that the action was commenced against PHS on November 25, 2003, and having concluded that neither the continuing violation nor relation-back doctrine applies, the Court will proceed to determine whether Plaintiff's § 1983 claims are time-barred.  Any claims that accrued two years before the November 25, 2003 date will be time-barred.  Thus, the starting point is to determine when Plaintiff's § 1983 claims accrued.

As noted above, § 1983 claims accrue, for the purpose of the statute of limitations, when the plaintiff knows or has reason to know "of the existence and cause of injury which is the basis for his action.[49]  The Court must make these determinations for both Plaintiff's tinted lens claim and his eye drops claim.

Turning first to Plaintiff's tinted lens claim, the Court must determine when Plaintiff first knew that (1) he was injured due to the delay in getting his tinted lenses, and (2) PHS was responsible for causing that injury.  Plaintiff claims that he was prescribed tinted lenses on July 31, 2001.  Plaintiff alleges that he did not receive those prescribed lenses until May 14, 2003.  Plaintiff states in his affidavit that, without tinted lenses, he suffered pain from sunlight and that in the summer months he stayed in his cell rather than go outside for designated outside activities.  Plaintiff also alleges in his response to the Motion for Summary Judgment that his "serious medical condition caused him pain and difficulty seeing,"[50] which the Court will construe—for purposes of applying the statute of limitations only—to be a statement of his alleged injury.  Plaintiff does not allege when he began to suffer pain and difficulty seeing; however, it is only logical to conclude that it would

---

[49]*Kripp v. Luton*, 466 F.3d 1171, 1175 (10th Cir. 2006) (citations omitted). *Accord Hunt v, Bennett*, 17 F.3d 1263, 1266 (10th Cir. 1994); *Johnson,* 925 F.2d at 1302.

[50]Pl.'s Am. Resp. to Def.'s Mot. for Summ. J. (doc. 262) at p. 4, Fact No. 20.

have occurred in the summer months of 2001 and that he would have suffered the pain before November 25, 2001.  Also, the record reveals that Plaintiff filed a grievance with prison officials on September 3, 2001, complaining about the delay in receiving his tinted lenses.

In light of the above, the Court concludes that, *prior to November 25, 2001*, Plaintiff knew (1) that he had not received the allegedly prescribed tinted lenses, and (2) that he suffered the alleged pain from the sunlight and had difficulty seeing.  Plaintiff therefore "knew of  the existence and cause of the alleged injuries" that are the basis of his tinted lenses claim prior to November 25, 2001. Accordingly, the Court rules that Plaintiff's § 1983 claim relating to the tinted eyeglasses is time-barred.

The Court will now apply the same analysis to Plaintiff's claim that he was denied his medicated eye drops.  The first occasion[51] on which the Court finds that Plaintiff did not receive his eye drops and which could arguably form the basis of a § 1983 claim was August 30, 2001. Plaintiff also failed to receive his eye drops on August 31, 2001, and on September 1, 2, 5, 16, 20, and 23, 2001.  Any claims related to those occasions are clearly time-barred as they occurred before November 25, 2001.  Any claim based on the incident occurring in mid-October of 2001, where Plaintiff did not receive his eye drops because he feared he was not receiving the right prescription or that the bottle might have been tampered with, would also be time-barred.

---

[51]As discussed above, Plaintiff did not receive his eye drops on August 4, 2001.  The Court, however, found that the reason Plaintiff did not receive his drops that day was because Plaintiff failed to come to the medication line to receive them, and there is no evidence that PHS caused Plaintiff to not receive them.  Also, as discussed above, although Plaintiff was without eyedrops on August 21 and 22, 2001, the facts show that Plaintiff was at fault in prematurely depleting his supply.   Even if the Court were to consider these occasions as giving rise to a § 1983 claim, they would be time barred, as they occurred prior to November 25, 2001.

On the other hand, claims relating to the occasions on December 2, 13, and 25, 2001, and April 13, 2002, when Plaintiff did not receive his eye drops in the morning, fall within the limitations period and are therefore not time-barred.  Similarly, the period in October 2003 when Plaintiff was without eye drops falls within the limitations period and those claims are not be time-barred.

### 4.    Conclusion as to the timeliness of Plaintiff's § 1983 claims

To summarize, Plaintiff's § 1983 claims are deemed to have commenced against PHS on November 25, 2001, the date Plaintiff moved to amend the Complaint to join PHS as a defendant. Plaintiff's § 1983 claims are subject to a two-year statute of limitations, with the claims accruing on the dates that Plaintiff knew, or had reason to know, of the existence and cause of injuries which are the basis for his § 1983 claims.  With respect to his claim that PHS delayed in providing the tinted eyeglasses that were allegedly prescribed for him on July 31, 2001, the Court finds that Plaintiff knew of his injuries and PHS' alleged role in those injuries prior to November 25, 2001. The Court therefore holds that Plaintiff's § 1983 claim relating to the tinted eyeglasses is time-barred.  Plaintiff's argument that the continuing violation doctrine renders his tinted eyeglasses claim timely is unavailing, as that doctrine is inapplicable to § 1983 claims.  Plaintiff's additional argument that his tinted eyeglasses claim relates back to the filing of the initial Complaint under Rule 15(c)(3) also does not help Plaintiff, as he fails to satisfy the "mistaken identity" requirement of that doctrine.

With respect to Plaintiff's claim that PHS deprived him of his eyedrops, the Court finds that any deprivations that took place prior to November 25, 2001 are time-barred.  Again, the relation-back doctrine does not save any of those claims.  Only those deprivations that occurred after

30

November 25, 2001, i.e., those occurring on December 2, 13, and 25, 2001, on April 13, 2002, and in October 2003 may form the basis of Plaintiff's § 1983 claim.

   **C.     With Respect to His Surviving § 1983 Claims, Has Plaintiff Presented Sufficient Evidence That PHS Was Deliberately Indifferent to His Serious Medical Needs?**

   *1.     Establishing an Eighth Amendment claim relating to medical care*

   The Eighth Amendment's prohibition against cruel and unusual punishment creates an obligation on the part of prison officials to provide adequate health care to inmates.[52]  This standard applies to the denial or delay of access to medical care and to interference with prescribed treatment.[53]  This does not mean, however, that a mere complaint that a prison official has been negligent in diagnosing or treating a medical condition states a valid claim of medical mistreatment under the Eighth Amendment.[54]  Rather, a prisoner must allege acts or omissions sufficiently harmful to evidence intentional or wanton infliction of unnecessary pain that is "repugnant to the conscience of mankind" and offends "evolving standards of decency."[55]

   The Supreme Court in *Farmer v. Brennan*[56] elaborated on the standard for establishing a claim of deliberate indifference.  There, the Court stated:

   > Our cases have held that a prison official violates the Eighth Amendment only when two requirements are met.  First, the deprivation alleged must be, objectively, sufficiently serious; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities . . . .  The second requirement follows from the principle that only the unnecessary and wanton infliction of pain implicates

---

[52]*Estelle v. Gamble*, 429 U.S. 97, 103 (1976).

[53]*Id.* at 104-105.

[54]*Id.* at 105-106.

[55]*Id.*

[56]511 U.S. 825 (1994).

the Eighth Amendment.  To violate the Cruel and Unusual Punishments Clause, a prison official must have a sufficiently culpable state of mind. In prison-conditions cases that state of mind is one of "deliberate indifference" to inmate health or safety.[57]

In light of this standard, a prisoner must satisfy both an objective component and a subjective component to prevail on an Eight Amendment deliberate indifference claim.[58]  To satisfy the objective component, the prisoner must "produce objective evidence that the deprivation at issue was in fact 'sufficiently serious.'"[59] In other words, the plaintiff must show that he had sufficiently serious medical need for which he was deprived care.  A medical need is deemed sufficiently serious to meet this standard  "if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."[60]  Consequently, courts have held that a delay in providing medical care only constitutes an Eight Amendment violation where the plaintiff can show the delay resulted in "substantial harm."[61]  The substantial harm requirement "may be satisfied by lifelong handicap, permanent loss, or considerable pain."[62]  In sum, to satisfy the objective prong, the prisoner must demonstrate "that

---

[57]*Id*. at 834.

[58]*Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005); *Sealock v. Colo.*, 218 F.3d. 1205, 1209 (10th Cir. 2000).

[59]*Mata*, 427 F.3d at 751; *Sealock*, 218 F.3d at 1209 (quoting *Farmer v. Brennan*, 511 U.S. at 834).

[60]*Sealock*, 218 F.3d at 1209 (quoting *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999)).

[61]*Mata*, 427 F.3d at 751 (quoting *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001)).  *Accord Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999).

[62]*Mata*, 427 F.3d at 751 (quoting *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001)).

[his/]her medical need was objectively sufficiently serious, and that defendants' delay in meeting that need caused [him/]her substantial harm."[63]

To satisfy the subjective component, the prisoner must present evidence of the prison or prison official's "deliberate indifference," which is also referred to as "culpable state of mind."[64] The prisoner must show that the prison or prison official knew of and disregarded "an excessive risk to inmate health or safety."[65]  The official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [the official] must also draw the inference."[66]

 Deliberate indifference may be manifested by prison health care providers' responses to the prisoner's needs or by guards' intentional delay or denial of access to medical care that has been prescribed.[67]  More specifically,  "[a] deliberate refusal on the part of prison officials to provide an inmate with prescribed medication may demonstrate such deliberate indifference."[68]  Deliberate indifference in this context, however, "does not require proof of an intent to inflict pain nor a

---

[63]*Id.* at 752.  *Accord Sealock,* 218 F.3d. at 1210.

[64]*Mata*, 427 F.3d at 751.

[65]*Sealock*, 218 F.3d 1209 (quoting *Farmer,* 511 U.S. at 837).

[66]*Mata*, 427 F.3d at 751 (quoting *Farmer,* 511 U.S. at 837).

[67]*Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999) (citing *Estelle,* 429 U.S. at 104-06).

[68]*O'Bryan v. Sedgwick County*, No. 98-3308-JTM, 2000 WL 882516, at *6 (D. Kan.  June 12, 2000) (citation omitted).

detailed inquiry into to the officials' state of mind, but the officials' conduct or lack of conduct must demonstrate a knowing indifference to serious medical needs."[69]

The Supreme Court has held that the deliberate indifference standard lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other."[70]   The Supreme Court in *Farmer* likened this standard to "criminal recklessness," which makes a person liable when he or she "consciously disregard[s] a substantial risk of serious harm.[71]

Consequently, it is not enough that a prisoner establish that the prison or prison official was negligent or even grossly negligent as defined by civil law.[72]  This is because in the medical context, an inadvertent or even grossly negligent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind."[73]  Thus, it is well settled that medical malpractice is not sufficient to state a claim of deliberate indifference.[74]  Nor is a difference of opinion about the prisoner's medical treatment or

---

[69]*Id.* (citation omitted).

[70]*Farmer*, 511 U.S. at 836.

[71]*Id.* at 836-38.

[72]*Barrie v. Grand County*, 119 F.3d 862, 869 (10th Cir. 1997); *Berry v. City of Muskogee*, 900 F.2d 1489, 1495-96 (10th Cir. 1990); *Belcher v. Loftness*, No. 03-3261-JWL, 2005 WL 2323222, at *5 (D. Kan. Sept. 22, 2005).

[73]*Estelle*, 429 U.S. at 105-06.  *See also Whitley v. Albers*, 475 U.S. 312, 319 (1986) (to be actionable under the Eighth Amendment, the defendant's conduct "must involve more than ordinary lack of due care for the prisoner's interest or safety").

[74]*See, e.g., Self v. Crum*, 439 F.3d 1227, 1234 (10th Cir. 2006); *Sealock ,* 218 F.3d at 1211.

a disagreement between a prisoner and prison medical staff regarding the type and timing of medical treatment sufficient to establish deliberate indifference.[75]

Applying these standards to this case, in order for Plaintiff to avoid summary judgment on his Eighth Amendment claim, Plaintiff must establish the following:  First, Plaintiff must satisfy the objective component by setting forth facts which demonstrate that his medical need was objectively sufficiently serious, that PHS delayed in meeting that need, and that PHS' delay caused him substantial harm.  Second, Plaintiff must satisfy the subjective component by providing evidence supporting an inference that PHS knew about and disregarded a substantial risk of harm to his health.[76]

>           *a.       Has Plaintiff satisfied the objective component?*

PHS concedes, for purposes of summary judgment, that "Plaintiff's eye condition involved a serious medical need."[77]  Nonetheless, to avoid summary judgment Plaintiff must set forth facts demonstrating that PHS' delay or inaction in meeting that need cause him substantial harm.  Plaintiff has not demonstrated any substantial harm, and no reasonable jury could find such harm.  As noted above, the substantial harm requirement may be satisfied by showing that the plaintiff suffered a

---

[75]*Olson v. Stotts*, 9 F.3d 1475, 1477 (10th Cir. 1993); *Johnson v. Stephen*, 6 F.3d 691, 692 (10th Cir. 1993); *O'Bryan,* 2000 WL 882516, at *6.

[76]*Mata*, 427 F.3d at 752 ("Accordingly, in order for Ms. Mata to avoid summary judgment on her Eighth Amendment claims, she was required to set forth facts demonstrating that her medical need was objectively sufficiently serious, and that defendants' delay in meeting that need caused her substantial harm.  Then, to meet the subjective prong of the deliberate indifference test, Ms. Mata was required to provide evidence supporting an inference that defendants knew about and disregarded a substantial risk of harm to her health and safety.").

[77]PHS' Mem. in Supp. of Mot. for Summ. J. (doc. 225) at p. 9.

lifelong handicap, permanent loss, or considerable pain as a result of the defendant's action or inaction.

Here, Plaintiff has not demonstrated any handicap, permanent loss or damage, or considerable pain resulting from not receiving his eye drops the mornings of December 2, 13, and 25, 2001, the morning of April 13, 2002, and the indeterminate period in October 2003. Although Plaintiff seeks to recover for alleged damage to his optic nerve, a decrease in his peripheral visual field, and the advancement of his glaucoma, there is no expert testimony in the record regarding any such damage.

Moreover, the only evidence of pain supported by the record is Plaintiff's statement that sunlight caused him pain. That pain was not caused, however, by any failure to receive his eye drops, but rather by the photophobia. Plaintiff's only other mention of pain or suffering is his unsupported claim that "Plaintiff's serious medical condition caused him pain and difficulty seeing." This is not sufficient to establish that Plaintiff suffered substantial harm as a result of not receiving the eye drops for two reasons. First, it is not supported by the record.[78] Second, it refers to his "condition" causing him pain and difficulty, that is, it is the glaucoma itself that causes him pain and difficulty and not the failure to receive his eye drops.

In addition, the medical records from the relevant time period, i.e., from December 2, 2001 to the end of his incarceration, belie Plaintiff's claim that his eyes were injured by not receiving the eye drops on the noted days. Plaintiff did not receive his eye drops the mornings of December 2,

_____

[78]Although Plaintiff makes this allegation in ¶ 20 of his Response to PHS's Statement of Uncontroverted Facts, as noted above, Plaintiff fails to identify and provide any support for this allegation.

13, and 25, 2001. Yet, when Plaintiff was seen by the opthalmologist Dr. Griffith on January 24, 2002, Dr. Griffith reported that Plaintiff's glaucoma was controlled with medication.

Plaintiff next missed his eye drops the morning of April 13, 2002. There is no medical record or testimony in the record indicating that Plaintiff suffered any adverse reaction or harm from missing his medication that morning. Almost two month later, when Plaintiff was next seen by Dr. Griffith on June 6, 2002, Dr. Griffith did find that Plaintiff's IOP was not controlled at that time. There is nothing to indicate, however, that the fact Plaintiff missed his medication that one morning contributed to the increased IOP. Indeed, Plaintiff had received his eye drops twice daily during that 133-day period, and only missed one morning's dose.

The next time Plaintiff missed his eye drops was in early to mid-October 2003. The records do not reveal how many days Plaintiff missed his eye drops. However, there is no medical evidence in the record showing that Plaintiff suffered any adverse effect or injury from missing his drops during that period. Plaintiff was examined by an optometrist, Dr. Torrence on September 11, 2003, and Dr. Torrence determined that Plaintiff's pressure and eyes were doing well. Dr. Torrence examined Plaintiff again on November 28, 2003, and again he found that Plaintiff's eyes were doing well. Moreover, no eye care specialist has ever told Plaintiff that any alleged delay in receiving his medication during the relevant time period caused damage to his eyes.

The Court finds that Plaintiff has failed to establish any facts that satisfy the first component of the deliberate indifference standard, i.e., that he suffered a "sufficiently serious deprivation" as a result of PHS' actions or inactions. Plaintiff merely *alleges* that as a result of missing his eye drops on various isolated occasions he suffered pain and difficulty seeing and states that he *believes*

37

the delay in receiving his eye drops damaged his eyes.   Conclusory allegations and subjective beliefs, however, are not sufficient to meet his burden on summary judgment.

Plaintiff has the burden to satisfy the objective standard and to show that he suffered a lifelong handicap, permanent loss, or considerable pain as a result of PHS' action or inaction.  In the absence of an adequately supported factual scenario that Plaintiff suffered substantial medical consequences by not receiving his prescribed eye drops, Plaintiff cannot establish an essential element of his § 1983 claim.  Summary  judgment is therefore appropriate.

### b.        Has Plaintiff satisfied the subjective component?

Even if the Court were to hold that Plaintiff had met his burden on summary judgment to establish the objective component of his claim, the Court would nevertheless find that Plaintiff had failed to meet his burden to establish the subjective component of his claim.  To establish that subjective component Plaintiff must provide evidence supporting an inference that PHS knew about and disregarded a substantial risk of harm to his health.  It is not enough for Plaintiff to establish that PHS was negligent or even grossly negligent as defined by civil law.[79]  Even if the Court were to deem PHS' failure to provide Plaintiff with the eye drops on the occasions noted to be negligent or woefully inadequate, its conduct would still not constitute "an unnecessary and wanton infliction of pain" or be deemed  "repugnant to the conscience of mankind," as required to establish an Eighth Amendment claim of deliberate indifference."[80]

---

[79]*Barrie,*119 F.3d at 869; *Berry,* 900 F.2d at 1495-96; *Belcher,* 2005 WL 2323222, at *5.

[80]*Estelle*, 429 U.S. at 105-06.  *See also Whitley v. Albers*, 475 U.S. 312, 319 (1986) (defendant's conduct "must involve more than ordinary lack of due care for the prisoner's interest or safety" to establish deliberate indifference).

Plaintiff has established only that he was denied his eye drops the mornings of December 2, 13, and 25, 2001, the morning of April 13, 2002, and for a indeterminate number of days in early to mid-October 2003.  Except for those occasions, Plaintiff received his eye drops on a daily or twice-daily basis during the period November 25, 2001 to February 24, 2004, the date he was released from custody.  He was also evaluated by an opthalmologist on a regular basis during that time.  In addition, he was seen by an optometrist on many occasions.

Plaintiff's own medical expert, Dr. Rettig, opined in her deposition that none of Plaintiff's providers breached the standard of care in their treatment of Plaintiff's eye condition.  She also testified that Plaintiff had been seen by an ophthalmologist a sufficient number of times.  While Dr. Rettig did have certain criticisms regarding Plaintiff's care (Dr. Torrence's failure to note Plaintiff's exact pressure on one occasion, the cancellation of an opthalmologist appointment, and the apparent lack of eye drops some time in October 2003), those criticisms do not show that PHS acted in a criminally reckless manner or in wanton disregard of a substantial risk of harm to Plaintiff's health.

In short, Plaintiff's care providers recognized Plaintiff's condition and provided ongoing monitoring and treatment.  The fact that he did not receive his eye drops on isolated occasions is not sufficient to establish deliberate indifference.[81]  Indeed, Plaintiff's occasional failure to receive his eye drops can scarcely be said to offend accepted standards of decency, indicate obduracy, constitute recklessness in the criminal-law sense, or amount to the wanton infliction of unnecessary pain.

---

[81]A finding that the defendant's neglect of a prisoner's condition was an isolated occurrence or an exception when compared to the defendant's overall treatment of the prisoner ordinarily militates against a finding of deliberate indifference. *McGuckin v. Smith,* 974 F.2d 1050, 1060 (9th Cir. 1992), *overruled on other grounds, WMX Tech, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997).

In short, the Court finds that there is no evidence of a deprivation that was sufficiently serious to meet the objective component. As Plaintiff fails to establish this essential element of his claim, summary judgment is appropriate on his § 1983 claim relating to his medicated eye drops.

## IV.    Analysis of Plaintiff's Breach of Contract Claim

Plaintiff claims that "he is a third-party beneficiary of the contract between PHS and the KDOC," and that PHS breached the contract "by failing to provide him with adequate medical care."[82] PHS moves for summary judgment on this claim, arguing that Plaintiff has not shown any facts that PHS breached any duty to provide appropriate medical care to Plaintiff as a third-party beneficiary of the KDOC contract. PHS asserts that the uncontroverted facts show that Plaintiff "received not only adequate, but extraordinary, care for his medical condition."[83]

Neither party has provided the Court with the contract between PHS and KDOC that forms the basis of Plaintiff's breach of contract claim. The Court is therefore unable to determine what duties might have been owed Plaintiff, and, thus, the Court cannot determine what actions or inactions of PHS would constitute a breach of the contract. Accordingly, the Court cannot determine whether there are any genuine issues as to any material facts or that PHS is entitled to a judgment as a matter of law on this claim. The Court must therefore deny PHS' motion for summary judgment on Plaintiff's breach of contract claim.

**IT IS THEREFORE ORDERED** that Prison Health Services, Inc.'s Motion for Summary Judgment (doc. 224) is granted with respect to Plaintiff's claims arising under 42 U.S.C. § 1983, and

---

[82]Pretrial Order (doc. 216), ¶ 6.a.(2).

[83]Mem. in Supp. of Mot. for Summ. J. (doc. 225) at p. 11.

judgment will be entered in favor of Defendant Prison Health Services, Inc. and against Plaintiff

Kenneth R. Sellers on his claims arising under § 1983.

**IT IS FURTHER ORDERED** that  Prison Health Services, Inc.'s Motion for Summary

Judgment (doc. 224) is denied with respect to Plaintiff's claim for breach of contract.

**IT IS SO ORDERED**.

Dated in Kansas City, Kansas on this 12th day of July 2007.


                                                            s/ David J. Waxse
                                                            David J. Waxse
                                                            U.S. Magistrate Judge

cc:      All counsel and *pro se* parties